CRAWLEY, Judge,
dissenting.
On October 26, 1996, L.C. (the “birth mother”) gave birth to a baby boy (the “child”) in her parents’ home. B.F., the man thought to be the father of the child, was not immediately notified of the child’s birth. L.C. and her parents quickly decided to place the child for adoption; a family friend referred them to L.J. (the “adoptive mother”), a single woman desiring to adopt a child. The following day, the necessary papers were executed and the adoptive mother took the child to Birmingham. On October 29, the adoptive mother filed a petition for adoption in the Probate Court of Jefferson County. The petition named B.F. as the father.
B.F. was first notified of the child’s birth on October 29 by the maternal grandmother. The maternal grandmother requested his consent to the adoption. He refused to consent; in fact, he went to see the birth mother and asked her to withdraw her consent to the adoption. She refused to do so, and he filed an objection to the adoption on November 7,1996.
On December 6, 1996, B.F. and members of his family visited the child at the adoptive mother’s home in Birmingham. The adoptive mother indicated at that visit that she would permit future visits by B.F. and his family. However, on December 18, 1996, the adoptive mother filed an amendment to her petition for adoption challenging B.F.’s standing to object to the adoption because he had not established *1030 paternity. B.F. immediately undertook to establish paternity. Unfortunately, because of circumstances beyond any of the parties’ control, the paternity determination was not made until nine months later. [1] B.F. was determined to be the father. After he set about to prove his paternity, B.F. and his parents did not visit the child at the adoptive mother’s home.
At the hearing on the adoption, the adoptive mother argued that B.F. had impliedly consented to the adoption by his conduct before the child was born (“pre-birth abandonment”) or by his failure to maintain a parental relationship with the child while his paternity was being established. See Ala.Code 1975, § 26-10A-9. After taking testimony, the trial court determined that B.F. had impliedly consented to the adoption. B.F. appeals, arguing that the trial court erred when it concluded that he had impliedly consented to the adoption. I agree and I would reverse the trial court’s judgment.
Adoptions in Alabama are governed by the Alabama Adoption Code, found at Ala. Code 1975, § 26-10A-1 through -38. Section 26-10A-17(a)(10) requires that the putative father, if known by the court, receive notice of the adoption proceeding. If the putative father responds to the notice within 30 days, then § 26-10A-7(5) provides that the consent of the putative father to the adoption is required. Consent to an adoption, if express, must be in writing, § 26-10A-11; however, § 26-10A-9 recognizes implied consent. Section 26-10A-9 provides:
“A consent or relinquishment required by Section 26-10A-7 may be implied by any of the following acts of a parent:
“(1) Leaving the adoptee without provision for his or her identification for a period of 30 days;
“(2) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months; or
“(3) Receiving notification of the pendency of the adoption proceedings under Section 26-10A-17 and failing to answer or otherwise respond to the petition within 30 days.”
B.F. states that the trial court, in concluding that B.F. had impliedly consented to the adoption, relied on subsection (2). The adoptive mother agrees. B.F. argues, among other things, that the trial court erred in determining that the factual circumstances of this case amounted to implied consent under the statute. Both parties concede that the trial court very likely considered B.F.’s lack of visitation or other contact with the child between the December 6, 1996, visit and his request for visitation on or about October 14,1997, after the determination of paternity was finally made on October 10,1997.
At the hearing, the testimony concerning B.F.’s knowledge of the birth mother’s pregnancy was disputed. Although B.F. testified that the birth mother told him in April or May 1996 that she was not pregnant, the birth mother adamantly denied ever telling him this. Her testimony indicated that B.F. knew of her pregnancy and yet did nothing other than tell her that he would assist her in obtaining an abortion or help her raise the child. Both B.F. and the birth mother testified that adoption was not discussed as an option. B.F. also testified regarding his decision not to visit the child in the adoptive mother’s home after the December 6, 1996, visit. He stated that his parents and his attorneys advised him against visiting the adoptive mother’s home. B.F.’s mother testified that she advised B.F. not to visit because the adoptive mother was single and visiting her alone might look inappropriate and *1031 because the adoptive mother was an attorney who could possibly “twist” things B.F. did or said.
The adoptive mother argues that this case is governed by the ore tenus rule; that is, she contends that this court cannot reverse the trial court because its conclusion that B.F. impliedly abandoned the child is based upon ore tenus evidence that the trial court alone has the duty to weigh and therefore carries a presumption of correctness. See, generally, S.W.B. v. R.C., 668 So.2d 835, 836 (Ala.Civ.App.1995). Were this truly an ore tenus case, she would be correct. However, the adoptive mother overlooks an important fact: the trial court’s legal conclusion that B.F.’s conduct resulted in implied abandonment is a result of the application of the law to the undisputed fact that B.F. did not visit or otherwise maintain contact with the child during the pendency of the paternity determination. Such a conclusion “do[es] not come within the purview of the ‘presumption of correctness standard.’ ” Ex parte Curry, 607 So.2d 230, 231 (Ala.1992) (quoting Ex parte Eastwood Foods, Inc., 575 So.2d 91, 93 (Ala.1991)). Therefore, this court can, and should, consider whether B.F.’s conduct can legally amount to implied abandonment. After considering B.F.’s conduct, the definition of implied abandonment, and the legal principles governing paternity and support issues, I conclude that it cannot.
B.F. contends that he cannot be held to have impliedly consented to the adoption because of his failure to maintain a significant parental relationship with the child during the time he was establishing paternity. He argues that because he had not yet been adjudicated the father, he had no parental relationship with the child and, therefore, no rights or duties as to the child. B.F. timely took all legal steps necessary to establish and to preserve the parent-child relationship by objecting to the adoption in the first place and by participating in the paternity proceedings. In my opinion, his actions in taking these steps show that B.F. did not abandon the child. In addition, I conclude, as B.F. argues, that he, as a putative father, could not have impliedly consented to the adoption by not exercising the rights or performing the duties of a parent because he was not yet proven to be the child’s father.
The adoptive mother argues that a holding that B.F. had no rights regarding the child and no duty to the child during the period while he was establishing paternity would violate public policy because children are in need of nurturing and bonding and in need of financial support. She indicates in her brief that the issue presented is a “novel one.” Although the exact issue whether implied consent can arise under the circumstances of this case is indeed a novel question, my decision that B.F. could not have impliedly consented to the adoption of the child during the time he was establishing paternity rests on well-settled legal principles.
The adoptive mother’s position in this ease is inconsistent. She challenged B.F.’s standing in the trial court because he had not established paternity; yet, she argues on appeal that he should have assumed the duties of a father while his paternity was in question. Because he did not fulfill the duties of a parent during the paternity proceeding, she argues, he has abandoned the child and has impliedly consented to the adoption. This argument, based essentially on B.F.’s failure to visit or to support the child during the pendency of the paternity proceeding, is untenable.
The adoptive mother petitioned the court for adoption of a child that she had removed to her own home within 24 hours of its birth. By law, the court was required to, and did, issue an interlocutory order granting her custody and the responsibility for the care, maintenance, and support of the child pending the finalization of the adoption. Ala.Code 1975, § 26-10A-18. B.F. was not required to support the child during the pendency of the adoption proceedings; pursuant to law, the adoptive mother undertook full responsi *1032 bility for the child when she filed the petition. B.F.’s “failure” to provide support while the child was in the adoptive mother’s home, then, cannot be considered to have any bearing on whether he impliedly consented to the adoption. To abandon a child, a parent must have a right and an obligation to that child.
In the past, the paternity of an illegitimate child was established by what was commonly called a “bastardy” proceeding. See Keener v. State, 347 So.2d 398 (Ala. 1977); see also Ex parte University of South Alabama, 541 So.2d 535, 540 (Ala.1989) (Maddox, J., dissenting) (explaining that the law has always placed the responsibility for the maintenance and support of a minor child on the natural father of that child, once paternity was established). Once paternity was established in such a proceeding, the father became subject to “all the obligations for the care, maintenance and education of the child as are imposed upon fathers of legitimate children.” Keener, 347 So.2d at 401. The reverse must also be true: until paternity is proven, a man is not subject to “all the obligations for the care, maintenance and education of the child as are imposed upon fathers of legitimate children.” Id. Our supreme court has stated that paternity must be established before a duty of support arises in the father. Ex parte State of California, 669 So.2d 884, 885 (Ala.1995). Likewise, the other duties owed to a child by a father do not arise until a man is proven to be the father.
If a man has no duty to a child during the period before he is determined to be the father of that child, how can he fail to fulfill that duty by any action or inaction on his part? The statute permits a finding of implied consent if a parent leaves a child “with others without provision for support and without communication” or if the parent “otherwise [fails to] maintain[ ] a significant parental relationship” with the child for a six-month period. See § 26-10A-9(2). A man who has not yet been legally determined to be the father of a child, even if he is the putative father, is not a legal parent; he is not subject to “all the obligations for the care, maintenance and education of the child as are imposed upon fathers of legitimate children.” Keener, 347 So.2d at 401. Therefore, I conclude that B.F.’s failure to visit, contact, or support the child during the pen-dency, of the paternity proceeding cannot legally amount to implied abandonment under § 26-10A-9(2).
The adoptive mother also argues that B.F. abandoned the child before its birth and that this “pre-birth abandonment” was sufficient to imply consent. Alabama has not recognized “pre-birth abandonment.” Many of the other jurisdictions that have embraced the concept of “pre-birth abandonment” have relied on statutory schemes modeled on the Uniform Adoption Act (the “UAA”). See generally Comment, When Is a Biological Father Really a Dad? 24 Pepp. L.Rev. 959, 982-984 (1997); Lynn, Kirsch, Unwed Fathers and Their Newborn Children Placed for Adoption: Protecting the Rights of Both in Custody Disputes, 36 Ariz. L.Rev. 1011 (1994). The UAA specifically provides that, in deciding whether the biological father has abandoned the child, a court may scrutinize the father’s pre-birth conduct toward the expectant mother. See Unif. Adoption Act § 3-504(c), 9 U.L.A. 52. Alabama has adopted portions of the ABA Model State Adoption Act, see § 26-10A-9(i), Ala.Code 1975 (Comment), that do not specifically allow evaluation of the father’s “pre-birth conduct.” Even if Alabama were to embrace the concept of “pre-birth abandonment,” however, the facts of this case would not satisfy the test for abandonment.
Because of the legal principles discussed above, I conclude that the trial court misapplied the law to the facts of this case. A man who has not yet been determined to be the father of a child cannot impliedly abandon that child by failing to fulfill the duties of a parent. The trial court’s conclusion that B.F. impliedly abandoned his *1033 child is legally incorrect. I would reverse the trial court’s judgment.

. The blood for the paternity test could not be drawn from the child until he was six months old, and the testing laboratory also required a second sample from both the birth mother and the child.